# NO. 12-09-00099-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TRUMAN ARNOLD COMPANIES,* *APPELLANT* | § | *APPEAL FROM THE 217TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *HAMMOND AND CONSULTANTS* *ENTERPRISES, INC.,* *APPELLEE* | § | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Truman Arnold Companies appeals the trial court's judgment entered in favor of Hammond and Consultants Enterprises, Inc. Truman Arnold raises seven issues on appeal. We modify in part, and affirm as modified.

## BACKGROUND

Hammond and Truman Arnold entered into a contract pursuant to which Hammond assisted Truman Arnold in its efforts to obtain grocery store chains as customers for its gasoline and Truman Arnold paid Hammond commissions based on sales made to customers brought to it by Hammond. Initially, the contract provided that Hammond would receive 0.003 cents per gallon of gasoline Truman Arnold sold to one of Hammond's customers. But soon thereafter, the parties modified the contract to provide that Hammond's commission was one-half the net profit from every gallon of gasoline sold to one of its customers.[1]

---

[1] The parties disagree concerning the exact wording of the modification. Although Truman Arnold claims the modification was made in writing, the record contains no evidence of this written modification. Thus, while the parties agree that the contract was modified to provide that Hammond's commission was changed to one-half of the net profit, they disagree on the method to be utilized in calculating net profit.

In sum, a Hammond customer was a customer that Hammond contacted and put in touch with Truman Arnold. Truman Arnold determined the price that it would charge the customer for gasoline. If Truman Arnold ultimately sold the customer gasoline, Hammond was entitled to one-half the net profits from the sale. If, for any reason, Truman Arnold chose not to sell the customer gasoline, then Hammond was not entitled to receive a commission.

After several years, Hammond concluded that Truman Arnold was not paying all the commissions owed to it pursuant to the contract. Hammond and Truman Arnold had several meetings regarding this dispute. Eventually, Truman Arnold informed Hammond to hire an attorney if it wanted to be paid. In response, Hammond filed the instant suit for breach of contract.

The matter proceeded to a jury trial. Ultimately, the jury found that (1) Truman Arnold breached its contract with Hammond, (2) Hammond suffered damages of $12,875.00 from 1997 through 1999, damages of $324,568.00 from 2000 through 2008, and future damages of $498,245.00, and (3) Hammond incurred attorney's fees of $89,973.00 through trial, would incur $10,000.00 more in attorney's fees in an appeal to the court of appeals, and would incur $7,500.00 more in attorney's fees in an appeal to the Supreme Court of Texas. The trial court rendered judgment in accordance with the jury's verdict. This appeal followed.

## STATUTE OF LIMITATIONS

In its third issue, Truman Arnold argues that some of Hammond's claims for commissions are barred by the applicable four year statute of limitations.[2] Hammond contends that Truman Arnold failed to obtain a jury finding regarding its affirmative defense of limitations.

### Applicable Law

Breach of contract claims must be brought "not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 2002). To bar a suit based on limitations, the party asserting limitations must establish the applicability of the limitations statute and the date on which the opponent's cause of action accrued. *See Davis Apparel v. Gale-*

---

[2] In its brief, Truman Arnold argues that Hammond's claims for commissions due from 1997 through March 30, 2000, are barred by limitations. However, at oral argument, Truman Arnold clarified its position. Specifically, Truman Arnold stated that it contends Hammond's claims for commissions due from 1997 to 1999 are barred by limitations, but does not assert that Hammond's claims relating to commissions due from 2000 through 2008 are similarly time barred.

*Sobel*, 117 S.W.3d 15, 17 (Tex. App.–Eastland 2003, no pet.). A breach of contract cause of action generally accrues when the contract is breached. *See Slusser v. Union Bankers Ins. Co.*, 72 S.W.3d 713, 717 (Tex. App.–Eastland 2002, no pet.). However, the discovery rule may serve to delay the commencement of the limitations period for a breach of contract action. *See Barker v. Eckman*, 213 S.W.3d 306, 311–12 (Tex. 2005). For the discovery rule to apply, the nature of the injury must be inherently undiscoverable and the injury must be objectively verifiable. *See id.* at 312.

When the contract requires fixed, periodic payments, a separate cause of action accrues each time a payment is missed. *Slusser*, 72 S.W.3d at 717. Similarly, when payment for commissions earned is made in the wrong amount, the claim for the unpaid amount accrues at the time the commission payment was due. *See Kardell v. Union Bankers Ins. Co.*, No. 05-01-00662-CV, 2002 WL 1809867, at *3–4 (Tex. App.–Dallas Aug. 8, 2002, no pet.). As such, it has been held that claims for additional commissions are not inherently undiscoverable. *See Slusser*, 72 S.W.3d at 718. Thus, a claimant can recover any unpaid commissions that became due within the limitations period, but commissions due outside the limitations period are barred. *Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 363 (Tex. App.–Dallas 2009, pet. denied).

When the fact issues relevant to a limitations issue are established as a matter of law, the party asserting limitations is not required to obtain fact findings. *Barker*, 213 S.W.3d at 310. Additionally, when a party attempts to use the discovery rule to avoid limitations, the party seeking to benefit from the discovery rule has the burden of obtaining findings to support its application. *Id*.

**Analysis**

In the case at hand, Truman Arnold introduced into evidence Hammond's original petition filed on March 31, 2004. Truman Arnold also pleaded as an affirmative defense that Hammond's damages sought were barred by limitations. Thus, Truman Arnold argued at trial that the jury should not be asked about damages incurred by Hammond from 1997 through 1999.

Truman Arnold's third issue turns on the timing of Hammond's commissions. We look to the parties' contract to determine whether the parties addressed the timing of these payments.[3] The

---

[3] In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* If the written instrument is so worded that it can be given a

original written contract between the parties states, in pertinent part, that "[Truman Arnold] agrees to remit compensation on a _____ (Monthly) basis to [Hammond]." The method of determining compensation was later modified. But no evidence was presented that the timing of payment changed. Further, we note that the blank space before "(Monthly)" was not filled in. However, the parties' omission of additional language indicating the number of times per month Hammond should be compensated does not serve to render this section of the contract ambiguous. Based on our reading of the contract, Truman Arnold was required to make commission payments to Hammond on a monthly basis. Consequently, any commission payments Hammond earned from 1997 through 1999 had become due, and any cause of action related to those commission payments accrued more than four years before suit was filed. Accordingly, we hold that Truman Arnold presented sufficient evidence to establish that Hammond's claims for compensation due between 1997 through 1999 were barred as a matter of law by limitations. Because the claims were barred as a matter of law, no jury question was necessary on the issue. *See Barker*, 213 S.W.3d at 310. Truman Arnold's third issue is sustained in part and overruled in part. Accordingly, the damage award for compensation due between 1997 through 1999 should be reduced from $12,875.00 to $0.00.

**EXPERT WITNESS TESTIMONY**

In its second issue, Truman Arnold argues that the testimony of Hammond's expert witness, Robert Bailes, should have been excluded.

**Applicable Law**

Generally, the admission and exclusion of evidence is committed to the sound discretion of the trial court. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *see also Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). The trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998). "The test for abuse of discretion is whether the

---

certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Id*. We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used the terms in a technical or different sense. *See Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.–San Antonio 2001, pet. denied).

trial court acted without reference to any guiding rules or principles." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified, (2) the proposed testimony must be scientific, technical, or other specialized knowledge, and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *See* TEX. R. EVID. 702; *see also Robinson*, 923 S.W.2d at 556. In order to constitute the type of knowledge that will assist the trier of fact, the proposed testimony must also be relevant and reliable. *Id*. The trial court is responsible for making the preliminary determination of whether the proffered testimony meets the standards. *Id*. Rule 702's language makes no pertinent distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). Thus, any knowledge of these types might become the subject of expert testimony. *See id*., 526 U.S. at 147, 119 S. Ct. at 1174.

To be relevant, the proposed testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Additionally, any evidence that is not grounded "in the methods and procedures of science" is no more than "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993)). Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under rule 702. *Id*. A claim will not stand or fall on the mere allegation of a credentialed witness. *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

There are many factors that a trial court may consider in making the threshold determination of admissibility under rule 702. *Robinson*, 923 S.W.2d at 557. These factors include (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the theory or technique. *Id.* Additionally, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion

5

proffered." ***Gammill***, 972 S.W.2d at 726 (quoting ***Gen. Elec. Co. v. Joiner***, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)). A ***Daubert*** inquiry must be "tied to the facts" of the particular case. *See **Kumho Tire Co.***, 526 U.S. at 149, 119 S. Ct. at 1175 (quoting ***Daubert***, 509 U.S. at 594, 113 S. Ct. at 2786).

<u>Analysis</u>

In the instant case, Bailes carefully and specifically stated that he was not offering any expert opinions regarding Hammond's future damages. Rather, according to Bailes, he performed calculations extending the alleged damages sustained to date into the future and performed calculations discounting those numbers to present day dollars. But Bailes opined only about the value of Hammond's past lost commissions.

Truman Arnold argues that Bailes's testimony is flawed because he used the income and expenses for the entire division to determine an average profit per gallon of gasoline sold. From that figure, Bailes determined Hammond's lost commissions by multiplying the average profit per gallon of gasoline sold by the number of gallons sold to Hammond's customers and dividing that number by two. Truman Arnold argues that Bailes should have used the gross profit numbers provided by Truman Arnold for Hammond's customers, subtracted thirty-five points, or 0.0035 cents, per gallon as expenses, and divided that number by two. We disagree.

First, it is apparent that Hammond was skeptical concerning the accuracy of the figures provided by Truman Arnold. Truman Arnold did not produce documentation to establish the accuracy of its gross profit figures. The record further reflects that if Truman Arnold could not make money selling gasoline to a customer, it stopped selling to that customer. Further, Hammond had a duty to bring the customer to Truman Arnold, but it was Truman Arnold's obligation to negotiate any sales. As a result, Truman Arnold determined whether it would sell to a customer and at what price.

Moreover, the records Truman Arnold produced indicate unusual profit margins. Repeatedly, the figures indicate sales of millions of gallons of gasoline, which resulted in profit margins per gallon of gasoline sold that were much lower than the average per gallon of gasoline sold throughout the division. For instance, with regard to sales of more than 2.7 million gallons of gasoline to Brush Grocery from 2002 through 2005, the gross profit was only $13,211.25. For sales of more than 4 million gallons of gasoline to HEB from 2000 through 2005, the gross profit was

6

only $11,440.56. And perhaps most unusual, for sales of more than 100 million gallons of gasoline to KVAT Food from 2003 through 2005, the gross profit was only $222,151.49, a margin less than the thirty-five points per gallon that Truman Arnold alleged constituted its expenses per gallon.

Second, Truman Arnold complains that Hammond's skepticism concerning its gross profit figures should have resulted in a discovery dispute rather than Hammond's expert witness's relying on division wide figures to calculate gross profits. However, Hammond did, in fact, seek more specific information by requesting in discovery Truman Arnold's records concerning the total gallons sold, profits, and expenses on Hammond's claimed customers. Truman Arnold objected that these requests were overly broad and unduly burdensome. Hammond filed a motion to compel, which the trial court granted in part. Only then did Truman Arnold produce additional information. The record is not clear whether Truman Arnold withheld additional reports relevant to Hammond's claimed damages or if no additional information existed.

Even still, Hammond concluded that the reports produced by Truman Arnold contained inconsistencies. Hammond addressed these inconsistencies and obtained additional, more accurate reports from Truman Arnold. Thus, Hammond made efforts to have reliable information on which to base its damages calculations.

Third, Truman Arnold's preferred method of calculating net profits on Hammond's claimed clients ignores the existence of a large income stream. From its gasoline sales, Truman Arnold received rebates and credits. From 2000 through 2008, those rebates and credits amounted to millions of dollars in additional profits to Truman Arnold. Because the sales to Hammond's claimed customers contributed to a portion of Trumon Arnold's receipt of these additional profits, Bailes opined that this income stream should be considered. Because these profits were not tied to individual clients, the only method to include this additional income stream was to calculate the profits based on the average profit from the entire division.

Finally, Truman Arnold admits that the net profits could be only estimates. Yet Truman Arnold argues that using its gross profit figures for Hammond's claimed clients, subtracting thirty-five points per gallon of gasoline sold, and dividing that number by two more closely approximates Hammond's alleged lost commissions than Bailes's method. However, Truman Arnold's method is no less an estimate of Hammond's alleged lost commissions. Hammond should not be denied recovery simply because the exact amount of its damages is incapable of ascertainment. *See Vance*

7

*v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex. 1984). It follows that Bailes's opinion regarding Hammond's damages should not be excluded simply because the exact amount of Hammond's damages is incapable of ascertainment.

In sum, Bailes estimated Hammond's lost commissions. But calculating these commissions by obtaining a division wide average net profit per gallon and dividing that number by two does not result in such a great analytical gap between the data and the opinion proffered that the trial court's decision to allow his testimony to amount to a clear abuse of discretion. *See Gammill*, 972 S.W.2d at 726. Accordingly, we hold that the trial court did not abuse its discretion in allowing Bailes to provide his expert opinion concerning Hammond's damages suffered from 2000 through 2008. Truman Arnold's second issue is overruled.

## EVIDENTIARY SUFFICIENCY

In its first issue, Truman Arnold argues that the evidence supporting Hammond's award of damages is both legally and factually insufficient.

### Standard of Review

A party who challenges the legal sufficiency of the evidence to support an issue upon which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Bright v. Addison*, 171 S.W.3d 588, 595 (Tex. App.–Dallas 2005, pet. denied). When reviewing a challenge to the legal sufficiency of the evidence, we must determine "whether the evidence at trial would enable reasonable and fair minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we must credit favorable evidence if a reasonable finder of fact could, and disregard contrary evidence unless a reasonable finder of fact could not. *Id*. The finder of fact is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *See Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 557 (Tex. App.–Tyler 2007, pet. denied) (citing *City of Keller*, 168 S.W.3d at 819). The finder of fact is free to believe one witness and disbelieve another, and reviewing courts may not impose their own opinions to the contrary. *Id*. Accordingly, we must assume that the finder of fact decided all credibility questions in favor of the findings if a reasonable person could do so. *Id*. If a reasonable finder of fact could have done so, we must further assume

8

that the finder of fact chose what testimony to disregard in a way that favored the findings. *See Canal*, 238 S.W.3d at 557 (citing *City of Keller*, 168 S.W.3d at 820).

When considering a challenge to the factual sufficiency of the evidence, we examine the entire record to determine whether a finding is clearly wrong and unjust. *See Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 437 (Tex. App.–Texarkana 2006, no pet.). We must consider and weigh all of the evidence, not just the evidence that supports the verdict. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). We can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id*.; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). This court is not a fact finder. *See Justiss*, 202 S.W.3d at 437. Accordingly, we may not pass on the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would clearly support a different result. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Ellis*, 971 S.W.2d at 407. If we find the evidence is factually insufficient, we must clearly state why the finding is insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**Lost Profits**

Proof of damages based on lost profits does not require that the lost profits be susceptible to exact calculation. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001). However, the lost profits must be supported by competent evidence and demonstrated with reasonable certainty. *See id*. In determining whether the losses have been shown with reasonable certainty, we conduct a fact intensive analysis and require, at a minimum, that the losses be based on objective facts, figures, or data. *See id*.

Damages based on anticipated future lost profits cannot be recovered if they are dependent on uncertain and changing conditions, including market fluctuations, or if there is no evidence from which they may be intelligently estimated. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) (quoting *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938)). Evidence of past profits coupled with other facts and circumstances may establish lost profits with reasonable certainty. *See Helena Chem.*, 47 S.W.3d at 505.

*2000–2008 Damages*

9

We have previously held that the trial court properly admitted Bailes's testimony on past damages. Yet, even had we not considered Bailes's testimony, the result would not differ. Truman Arnold argues that Hammond's commissions were to be figured by first determining the gross profits from the sales of gasoline to Hammond's customers and deducting thirty-five points or 0.0035 cents per gallon. Hammond's commission was to be one-half of the resulting number. Hammond's exhibits 8 and 9 provided the jury with Truman Arnold's figures for gross profit and gallons of gasoline sold for the claimed Hammond customers. Consequently, the jury had the information necessary to perform Truman Arnold's preferred calculations. In performing those calculations, the jury could have awarded Hammond more than one million dollars in damages, but chose instead to award him $324,568.00. As such, we conclude that there is legally sufficient evidence to support the jury's award of damages to Hammond for 2000 through 2008.

Moreover, we have reviewed the entirety of the record and have considered and weighed all of the evidence. Having done so, we have not determined that any evidence tending to contradict the evidence supporting the jury's findings is of such character so as to cause us to conclude that the jury's award of damages for 2000 through 2008 is clearly wrong and unjust. Thus, we hold that the evidence is factually sufficient to support the jury's award of these damages.

### Future Damages

Turning to the jury's award of future damages, we again note that Bailes carefully explained that he was not offering an opinion regarding future damages. Bailes explained that he performed calculations based on Hammond's alleged lost profits from 2008, but had no opinion concerning whether those damages would occur in the future. Instead, he stated that the figures were provided so that the jury would have the present value of the future damages if it determined that an award of future damages was warranted.

Hammond testified that Truman Arnold's conduct would continue to cause him damages in the future. However, Hammond did not offer an opinion concerning the amount of damages that he would suffer in the future as a result of Truman Arnold's actions. Instead, Hammond, through Bailes's testimony, extended the damage calculation for 2008 into the future for what Hammond admitted was an "arbitrary" number of years. Hammond offered evidence that his customers were still purchasing gasoline from Truman Arnold. But there is no testimony from any of these customers establishing that any of them intended to purchase gasoline from Truman Arnold in the

10

future.  Further, no evidence was presented regarding the estimated amount of gasoline that would be purchased in the future or the estimated net profits that Truman Arnold would receive from such sales.  Based on our review of the record in the light most favorable to the jury's verdict, we conclude that the evidence is not legally sufficient to support the jury's award of future damages.

**Holding**

Truman Arnold's first issue is sustained with regard to the jury's award of future damages[4] and overruled with regard to the jury's award of damages from 2000 through 2008.  Accordingly, the damage award for future damages should be reduced from $498,245.00 to $0.00.

## JURY CHARGE

In its fourth and fifth issues, Truman Arnold contends that the trial court erred in refusing to include two proposed instructions in its charge.  Truman Arnold requested that the charge include the following instructions:

> You are instructed that Truman Arnold Companies breached its agreement with Hammond and Consultants Enterprises, Inc. with respect to a customer if:
>
> Hammond and Consultants Enterprises, Inc. was the procuring cause of a sale, if any, by Truman Arnold Companies to that customer; and
>
> Truman Arnold Companies failed to pay commissions to Hammond and Consultants Enterprises, Inc. on that sale.
> ….
>
> Consider the following elements of damages, if any, and none other:
>
> Unpaid commissions, if any, equal to one-half of the net profit to Truman Arnold Companies on Sales for which Hammond and Consultants Enterprises, Inc. was the procuring cause.

A trial court's refusal to include an instruction in the court's charge is reviewed under an abuse of discretion standard.  *See Magro v. Ragsdale Bros., Inc.*, 721 S.W.2d 832, 836 (Tex. 1986). To establish an abuse of discretion, the requested instructions must be necessary to enable the jury to render a proper verdict so that the court's refusal probably caused the rendition of an improper

---

[4] Because we have held that the evidence is legally insufficient to support the jury's award of future damages, we need not consider Truman Arnold's argument concerning the factual sufficiency of the evidence.  *See* TEX. R. APP. P. 47.1.

verdict. ***Pitts v. Sabine River Auth. of Tex.***, 107 S.W.3d 811, 819 (Tex. App.–Texarkana 2003, pet. denied). A trial court is required to submit a jury question if it controls the disposition of the case, is raised by the pleadings and evidence, and properly submits the disputed issues for the jury's determination. ***Id***. at 820. When a trial court refuses a requested jury instruction, we examine whether the instruction was reasonably necessary to enable the jury to render a proper verdict. *See* TEX. R. CIV. P. 277; ***Cleaver v. Cundiff***, 203 S.W.3d 373, 379 (Tex. App.–Eastland 2006, pet. denied). Because the jury should not be burdened with surplus instructions, not every correct statement of the law belongs in the jury charge. ***Cleaver***, 203 S.W.3d at 379.

The two instructions Truman Arnold requested are similar because they each contain the term "procuring cause." We initially note that neither of these written requests for instructions contains a definition of the term "procuring cause." At a minimum, a jury charge must define those words and other technical phrases that have distinct legal meanings. ***Barnett v. Coppell N. Tex. Court, Ltd.***, 123 S.W.3d 804, 826 (Tex. App.–Dallas 2003, pet. denied). The term "procuring cause" has a distinct legal meaning. *See* BLACK'S LAW DICTIONARY 1208 (6th ed. 1990) (defining "procuring cause"); *see also, e.g.,* ***Ramesh v. Johnson***, 681 S.W.2d 256, 260 (Tex. App.–Houston [14th Dist.] 1984, writ ref'd n.r.e.) (court defined "procuring cause" in its charge). Because Truman Arnold failed to make a written submission to the trial court of instructions that defined the legal term "procuring cause" contained in those instruction, it cannot now complain of the trial court's omission of those instructions. *See* TEX. R. CIV. P. 273; ***Jarrin v. Sam White Oldsmobile Co.***, 929 S.W.2d 21, 25 (Tex. App.–Houston [1st Dist.] 1996, writ denied).

Even assuming arguendo that Truman Arnold preserved the issue, the outcome would not differ. "Procuring cause" is defined as "the cause originating a series of events, which, without [a] break in their continuity, result in the accomplishment of the prime object." BLACK'S LAW DICTIONARY 1208. Thus, "a broker will be regarded as the 'procuring cause' of a sale, so as to be entitled to commission, if his or her efforts are the foundation on which the negotiations resulting in a sale are begun." ***Id.*** But the broker cannot be justly considered the procuring cause of the sale where the broker's effort with a buyer has, after fair opportunity and without any fault of the owner, resulted in no sale; the owner and buyer terminate their negotiations; and, later, the owner, by direct and independent negotiation effects a sale to the same buyer. *See* ***Goodwin v. Gunter***, 109 Tex. 56,

12

185 S.W. 295, 296 (Tex. 1916). This rule applies even if the sale is upon the same terms originally authorized by the broker. *See id.*

Here, the parties' contract makes no reference to "procuring cause." Pursuant to the plain language of the contract, Hammond was obliged to bring potential customers to Truman Arnold. If Truman Arnold later closed a sale with a Hammond customer, Hammond was entitled to receive a commission. Further, the language of the contract does not include any provision preventing Hammond from receiving commissions from sales of gasoline to a Hammond customer who stopped buying gasoline from Truman Arnold for a period of time, but who bought gas from it at a later date. Therefore, because the obligations placed upon Hammond by the contract do not use the term "procuring cause" or otherwise entirely embody the concept of "procuring cause," the trial court was not required to instruct the jury using this term. Accordingly, we hold that the trial court did not err in refusing to submit Truman Arnold's instructions that contained the term "procuring cause." Truman Arnold's fourth and fifth issues are overruled.

## ATTORNEY'S FEES AND INTEREST

In its sixth issue, Truman Arnold argues that the trial court erred in awarding prejudgment interest on attorney's fees. After Truman Arnold filed its appellate brief, the trial court rendered a judgment nunc pro tunc. The judgment nunc pro tunc removed the award of prejudgment interest on attorney's fees. Thus, Truman Arnold's sixth issue is overruled as moot.

In its seventh issue, Truman Arnold contends that the trial court failed to condition the award to Hammond of appellate attorney's fees on an unsuccessful appeal by Truman Arnold. Hammond argues that the requirement of an unsuccessful appeal is implied in the judgment. Nevertheless, Hammond agrees that the judgment could be reformed to clarify that the award of appellate attorney's fees is conditional. *See CPS Int'l, Inc. v. Harris & Westmoreland*, 784 S.W.2d 538, 545 (Tex. App.–Texarkana 1990, no writ) (prevailing party at trial who did not prevail on appeal not entitled to appellate attorney's fees and trial court's judgment reformed to delete that award). Truman Arnold's seventh issue is sustained.

13

<u>**CONCLUSION**</u>

We have sustained Truman Arnold's first issue with regard to future damages, its third issue in part with regard to damages from 1997 to 1999, and its seventh issue. We have overruled Truman Arnold's first issue with regard to 2000 to 2008 damages, its third issue with regard to damages in 2000, as well as its second, fourth, and fifth issues. We have overruled as moot Truman Arnold's sixth issue.

Accordingly, we *modify* the trial court's judgment in part by deleting the award of "EIGHT HUNDRED THIRTY-FIVE THOUSAND SIX HUNDRED EIGHTY-EIGHT AND NO/100 ($835,688.00) DOLLARS" and replacing it with an award of "THREE HUNDRED TWENTY-FOUR THOUSAND FIVE HUNDRED SIXTY-EIGHT AND NO/100 ($324,568.00) DOLLARS." We further *modify* the trial court's judgment so that the award of appellate attorney's fees is made conditional on Truman Arnold's being unsuccessful in an appeal. We *affirm* the trial court's judgment as *modified*.


**BRIAN HOYLE**
Justice



Opinion delivered July 30, 2010.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

14