Elizabeth A. BIRNBAUM,
et al., Appellants,

v.

SWEPI LP, et al., Appellees.

No. 04–00–00362–CV.

Court of Appeals of Texas,
San Antonio.

March 7, 2001.

Rehearing Overruled April 24, 2001.

Richard D. Sullivan, Law Offices of Richard D. Sullivan, Houston, Ronald O. Holman, Holman, Robertson, Eldridge, Biddle & McCorkindale, Dallas, for Appellant.

Arnulfo Guerra, Sr., Guerra & Guerra, Roma, Reagan D. Pratt, John E. O'Neill, Clements, O'Neill, Pierce, Nickens & Wilson, L.L.P., Houston, Abelardo Garza, Garza Law Firm, San Diego, Ben H. Shep-

pard, Jr., Mark C. Rodriguez, Vinson & Elkins, L.L.P., Houston, Donato D. Ramos, Person, Whitworth, Ramos, Borchers & Morales, Laredo, Paul D. Smith, Axelrod Smith & Kirshbaum, G. Stephen Parrott, Hoover, Bax & Slovacek, L.L.P., Houston, Patton G. Lochridge, McGinnis, Lochridge & Kilgore, Austin, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

## OPINION

PHIL HARDBERGER, Chief Justice.

This case involves the interpretation of an oil and gas lease. Appellants, a group of royalty owners ("Royalty Owners"), sued EOG Resources, Inc. f/k/a Enron Oil and Gas Company and its predecessors in interest, SWEPI LP f/k/a Shell Western E & P, Inc. and Shell Oil Company, (collectively the "Lessees") for breach of an oil and gas lease. The Royalty Owners claimed that the Lessees were required to pay royalties on gas used for compressor and plant fuel. The parties filed cross-motions for summary judgment, and the trial court rendered judgment in favor of the Lessees. The Royalty Owners assert two points of error on appeal contending the trial court erred in: (1) denying their objections to the affidavits of Stephen Lipari and B.P. Huddleston; and (2) granting summary judgment in favor of the Lessees because the evidence conclusively established that they were entitled to be paid royalties on the plant fuel and compressor fuel.

This case must be resolved based on the language used in the oil and gas lease and the stipulation of fact. Because we will not consider any of the affidavits in reaching our final disposition, we do not address the Royalty Owners' first point of error. *See* TEX.R.APP.P. 47.1 (court of appeals

need only address issues necessary to final disposition of appeal). We conclude that the trial court correctly interpreted the oil and gas lease and affirm the trial court's judgment.

## BACKGROUND

The oil and gas lease, as amended by a subsequent settlement agreement, provides, in pertinent part:

3(b) On all gas (exclusive of liquid hydrocarbons separated, extracted or manufactured therefrom under Subparagraphs (c) and (d)) produced from said lands, and used off the premises or sold, including casinghead gas and residue gas sold at the tailgate of any plant through which gas produced from said lands may be processed, one fifth (⅕) of the "value" (as hereinafter defined) of such gas ...

The "value" of the gas is defined as the volume of gas produced and used off the premises or sold measured in MMBtus multiplied by the "Index Price." The "Index Price" is defined as the quoted price per MMBtu dry for gas for the month of production published in the first issue of the production month in INSIDE FERC'S GAS MARKET REPORT for delivered spot gas, Houston Ship Channel/Beaumont, Texas, large packages (3,500 Mcf/d and up), maximum of range (high). The MMBtu's of the gas shall be determined at the field delivery point(s)—which is currently the tailgate of the plant—as the sum of the MMBtu's of methane and heavier hydrocarbons (exclusive of liquid hydrocarbons separated, extracted or manufactured, if any, pursuant to this paragraph and paragraphs (c) and (d) below) contained in such gas as determined by chromatographic analysis or other accepted method in the industry.

The parties entered into a Stipulation of Fact for purposes of the cross-motions for summary judgment. The exhibits attached to the Stipulation of Fact reference volumes of gas produced from the leased premises that were consumed as compressor fuel and plant fuel in order to process the gas prior to delivery for sale at a point downstream from the tailgate of the plant. Those volumes of gas were not included in EOG's calculation of royalty. The fuel consumed as compressor fuel and plant fuel was consumed at the processing plant location, and the processing plant is not located on the leased premises.

Gas streams from wells located on the leased premises are commingled with raw gas streams from other wells at the inlet of a treating plant. The plant is not owned by the Lessees. Prior to the commingling of the well streams at the inlet of the plant, volumes of gas from low pressure wells are run through separators located at the plant site for the removal of liquids and then compressed, utilizing compressors located on the plant site, in order to deliver gas to the plant at the required pressure. Volumes of gas from high pressure wells, which do not require compression, are run through separators located on the plant site for the removal of liquids and then delivered to the inlet of the plant.

The volume of the gas from all well streams is reduced as a result of the separation of the liquid. The commingled stream is further reduced by the removal of impurities in the plant. The impurities are removed to enable the gas to meet pipeline standards. After the gas is processed through the plant for the removal of impurities, a portion of the remaining volume is retained at the plant site for use as plant fuel and as compressor fuel. The

compressor fuel is used to compress gas from the low pressure wells prior to the commingling of the well streams at the plant's inlet. The volume retained for use as plant fuel and compressor fuel is metered at the plant and tested for Btu content prior to its use.

After the gas is processed for removal of impurities and after the volume to be retained for plant fuel and compressor fuel is removed, the remaining volume is delivered to the purchasers. At the delivery point, the volume is metered, and the amount of the MMBtus is determined. This delivery point to the purchasers is located at a point downstream from the plant site, approximately 200 feet downstream from the tailgate of the plant. The MMBtus measured at the delivery point are allocated proportionately to all of the wells that produced the original raw gas streams, including wells located on the leased premises, and royalties are paid on the allocated MMBtus.

In the Lessees' motions for summary judgment,[1] the Lessees asserted that they are only required to pay royalties on the "value" of the gas as defined in the oil and gas lease. The lease defines "value" as a given price multiplied by the volume of gas measured in MMBtus as determined at the field delivery point. The Lessees asserted that the only field delivery point at which the MMBtus are measured is the point at which the gas is delivered to the purchasers. Since the plant fuel and compressor fuel are removed prior to delivery, that volume is not included in the measurement.

In the Royalty Owners' motions for summary judgment,[2] the Royalty Owners contended that the Lessees are required to

---

1. Separate motions for summary judgment were filed by SWEPI and EOG.

2. Separate motions for summary judgment were filed by various groups of royalty owners.

pay royalty on the plant fuel and compressor fuel retained by the plant because it is gas "sold or used off the premises." Alternatively, the Royalty Owners argue that the Lessees are required to pay the plant for processing the gas, and, in an effort to reduce this cost, the Lessees provide the plant with free fuel. Because the oil and gas lease does not permit any deductions from the royalty to be paid for the Lessees' costs, the Lessees should not be permitted to indirectly recover the cost of the plant fuel and compressor fuel by failing to pay the Royalty Owners royalty on that gas.

The trial court granted the Lessees' motions for summary judgment and denied the Royalty Owners' motions for summary judgment. The judgment in favor of EOG states:

> ORDERED, ADJUDGED AND DECREED that based on the summary judgment evidence presented (a) no royalties are due and payable to Plaintiffs under the provisions of the oil and gas lease at issue in the above-referenced cause for any volumes of gas consumed as compressor fuel or plant fuel in order to process the gas from the subject lease prior to delivery for sale or use at the field delivery point, and (b) that the MMBtu's of the gas produced and sold from said lease will be determined for royalty calculation purposes at the field delivery point, which is currently located at the sales meter and delivery point to the purchaser at a point near to, but downstream from, the current treatment plant for the Rosita Field.

### INTERPRETATION OF OIL AND GAS LEASE

In their second point of error, the Royalty Owners contend that the trial court erred in granting summary judgment in favor of the Lessees because the undisputed summary judgment evidence conclusively established that the Royalty Owners were entitled to be paid royalty on the plant fuel and compressor fuel.

■■■ The construction of an unambiguous contract is a question of law, and we are not required to defer to any interpretation afforded by the trial court. *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983); *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 27 (Tex.App.—Amarillo 2000, [leave filed]). In construing an unambiguous oil and gas lease, our task is to ascertain the parties' intentions as expressed in the lease. *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. *See Heritage Resources, Inc.*, 939 S.W.2d at 121. We presume that the parties to a contract intend every clause to have some effect. *See Heritage Resources, Inc.*, 939 S.W.2d at 121. We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *See Heritage Resources, Inc.*, 939 S.W.2d at 121. Finally, we enforce an unambiguous agreement as written. *See Heritage Resources, Inc.*, 939 S.W.2d at 121. We are not permitted to rewrite the agreement to mean something it did not. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 27. "Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it." *Id.;* see also *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex.1998). Parties to a contract are "masters of their own choices and are entitled to select what terms and provisions to include in a contract." *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 27. "For a court to change an unambigu-

ous agreement merely because the court does not like the agreement, or because one of the parties subsequently found it distasteful, would be to undermine not only the sanctity afforded the contract but also the expectations of those who created and relied upon it." *Id.*

■ The Royalty Owners argue that the provision of the lease requiring payment of royalty for gas sold or used off the leased premises governs our construction. Under this argument, use of the gas for plant fuel and compressor fuel is a use off the leased premises. *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 241 (5th Cir.1984).

The Lessees argue that the term "tailgate" is defined as the place where a product leaves a refinery or processing plant. Applying that definition, the Lessees argue that royalty is only due on gas volume that leaves the plant. The Lessees further argue that the oil and gas agreement only contemplates one field delivery point, not multiple points, because the lease defines only one current field delivery point—the tailgate of the plant. This field delivery point, the tailgate, is the point at which the gas is metered when transferred to the purchasers' pipelines.

At the time the parties entered into the settlement agreement, they were aware that volumes of gas were being retained for plant fuel and compressor fuel prior to the delivery of the volume of gas through the tailgate of the plant. By defining the "value" of the gas on which royalties would be paid as the volume of gas measured in MMBtus multiplied by the Index Price, the parties intended that royalties would be paid only on the volume of gas for which MMBtus were measured. When they executed the settlement agreement, the parties were aware that MMBtus were being measured only at the delivery point to the purchasers. Because the parties

were aware that the volume of gas used for plant fuel and compressor fuel was removed prior to the gas reaching the tailgate of the plant, which the settlement agreement expressly stated to be the current field delivery point, and because the parties were aware that the MMBtu content of the retained volume was not being measured, the parties could not have intended that royalties would be paid on the volume of gas retained for plant fuel and compressor fuel.

### CONCLUSION

The trial court's judgment is affirmed.

Dissenting opinion by ALMA L. LÓPEZ, Justice.

LÓPEZ, Justice, dissenting.

I disagree that the parties to the oil and gas contract intended that royalties would be paid only on the volume of gas measured prior to delivery at a point downstream from the tailgate of the plant. The contract states that royalties would be paid on all gas produced and used off the leased premises. Use of gas for plant fuel and compressor fuel is a use off the leased premises. *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 241 (5th Cir.1984).

The majority opinion interprets the contract's "value" definition as an indication that royalties are not required to be paid on the plant fuel and compressor fuel because the MMBtus of the volume of gas retained at the tailgate of the plant is not measured. However, the contract's definition of "value" does not alter the volume of gas for which the contract requires royalties to be paid, and royalties are readily calculable for the retained gas under the contract's stated value formula. Both the volume and the Btu content of the retained gas is measured. Because the gas does

not undergo any further processing, the MMBtu content of the gas would not change between the tailgate of the plant, where the gas is retained and which is defined as the field delivery point in the contract, and the point downstream from the tailgate of the plant where the remaining gas is delivered. In fact, the charts provided in the stipulation of fact convert the measured Btu content of the retained gas to MMBtus.

The parties' intention that royalties should be paid on plant fuel and compressor fuel under the royalty provision at issue is further clarified when the royalty provision at issue is read in conjunction with the other royalty provisions contained in the contract. The other royalty clauses expressly state that the Lessees could use lease gas, royalty-free, for fuel in readying the gas and its products for market. If the parties had intended that lease gas could similarly be used royalty-free under the royalty provision at issue, the parties would have made the same express provision. I therefore dissent.