# NO. 12-12-00338-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *XH, LLC,* <br> *APPELLANT* | § | *APPEAL FROM THE 145TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *CABOT OIL & GAS CORP.,* <br> *APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

XH, LLC appeals the trial court's order denying its motion for summary judgment and granting summary judgment in favor of Appellee Cabot Oil and Gas Corporation and the Third Party Appellees.[1]  In two issues, XH argues that the trial court erred in denying its motion and granting the cross motions in favor of Cabot and the Third Party Appellees because (1) Cabot was required by an area of mutual interest agreement to offer it a proportional share of certain overriding royalty interests Cabot acquired and (2) the agreement complied with the statute of frauds.  We affirm.

---

[1] The Third Party Appellees are ARC COG Inc., Andrew L. Arguijo, Lowell Todd Armstrong, Robert J. Balcher, Thomas P. Belis, Kathleen Goodheart Belis, Nathan G. Brown, Triniti A. Brown, Norbert J. Burch, Ryan Cordes, G. Kevin Cunningham, Dan O. Dinges, Robert G. Drake, John S. Edmonds, James T. Edwards, John Robert English, II, Entrust Retirement Services, Inc., Aaron C. Erickson, Michael T. Erickson, L. Clay Fisher, Robin Fisher, Robert Fisher, Gordon P. Ganaway, Abraham D. Garza, Cynthia Garza, Rudolf E. Gaulke, Joan M. Gaulke, Larry W. Hairgrove, Brent D. Haraway, Laurie T. Hartman, Stephen D. Heron, III, Jane M. Heron, Carol W. Hoch, David R. Hoch, David L. Homan, Shirley M. Homan, Dan Houchin, Naomi Houchin, Thomas C. Huebinger, Jeffrey W. Hutton, Cathy C. Hutton, James S. Jameson, Monty January, Jeffery L. Klein, Kerry D. Knight, Andrew E. Lauden, Todd L. Liebl, Denise R. Liebl, Steven W. Lindeman, Karen E. Lindeman, Lisa A. Machesney, Molly S. Malone, James B. MacPherson, Katherine L. Muire, Tommy W. Moore, Rosa M. Moore, James J. Parr, Rock W. Petty, Shereen O. Petty, Nathan G. Ray, Marlene K. Reeve, Matt Reid, Todd M. Roemer, Cynthia T. Rose, Phil E. Rossiter, Daniel Robert Rowe, Nicolle J. Ryan, Scott C. Schroeder, Kathryn J. Schroeder, John J. Smelko, Jill L. Destenfano Smelko, Phillip L. Stalnaker, Stacia A. Stalnaker, George E. Taylor, Cheryl C. Taylor, Thomas D. Taylor, Allison Neal Thomas, II, Philip E. Towey, Lisa P. Day, David S. Waldrop, Cynthia W. Waldrop, Joseph Walunas, Matthew John Ward, Teresa Z. Williams, and Harold Writer.

BACKGROUND

In late 2007, Mullins and White Exploration, Inc. (M & W) and Hunt Petroleum Corporation (Hunt) executed a purchase agreement by which M & W would sell to Hunt eighty percent of its working interest in certain oil and gas leases located in Nacogdoches County, San Augustine County, and Shelby County, Texas. The parties further agreed that M & W would reserve an overriding royalty interest "on a lease by lease basis equal to the positive difference, if any, between twenty-five percent (25%) of gross production of oil, gas[,] and other hydrocarbons under the applicable lease and current royalty and overriding royalty burdens under the applicable lease."

Concurrently, the parties executed a joint operating agreement (JOA) that was attached as an exhibit to the Purchase Agreement. Among other things, the JOA contained an Area of Mutual Interest (AMI) provision dictating that when any party acquired "any oil and/or gas interest[,]" the nonacquiring party "shall have the right to acquire [its] proportionate interest therein . . . ." In accordance with the Purchase Agreement, M & W executed a partial assignment of its working interest in the leases to Hunt and reserved the overriding royalty interest in each of the leases assigned subject to the terms of the Purchase Agreement.

In June 2008, XH acquired Hunt's interest in the leases by merger. In April 2009, Guardian Oil & Gas, Inc., M & W's successor by name change, and XH agreed to amend Article XVI.G. of the JOA, which relates to subsequently created interests.

On February 25, 2010, following Cabot's successful bid on Guardian's overriding royalty interests, Guardian assigned these interests to Cabot. Cabot conveyed a portion of these interests to the Third Party Appellees.

After XH sought to enforce the AMI provisions in the JOA, Cabot filed the instant suit seeking a declaratory judgment that (1) it is not required to offer to XH the opportunity to purchase its proportionate share of the overriding royalty interests that it acquired from Guardian and (2) the AMI provisions in the Purchase Agreement and JOA violate the statute of frauds and are unenforceable. XH answered and filed a counterclaim seeking a declaration that (1) the AMI provisions in the JOA required Cabot to offer its proportional share of these interests to XH, (2) this provision did not violate the statute of frauds, and (3) Cabot is estopped from asserting the statute of frauds based on its prior performance under the contract. XH also sought to recover

2

under breach of contract. Moreover, XH sought to recover from the Third Party Appellees to whom Cabot conveyed a portion of these interests.

Thereafter, the parties each filed motions for summary judgment. On June 6, 2012, the trial court granted Cabot's and the Third Party Appellees' motions for summary judgment on the grounds relating to the AMI provisions, but denied the motions on the grounds relating to the statute of frauds. The trial court denied XH's motion in its entirety. This appeal followed.

## THE PURCHASE AGREEMENT, THE JOA, AND THE AMI PROVISIONS

In its second issue and part of its first issue,[2] XH argues that the trial court erred in denying its motion for summary judgment and granting summary judgment in Cabot's and the Third Party Appellees' favor because Cabot was contractually obligated to offer XH the right to purchase a proportionate share of the overriding royalty interests at issue.

## Standard of Review and Governing Law

Because the propriety of summary judgment is a question of law, we review the trial court's summary judgment determinations de novo. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The standard of review for a traditional summary judgment motion pursuant to Texas Rule of Civil Procedure 166a(c) is threefold: (1) the movant must show there is no genuine issue of material fact and he is entitled to judgment as a matter of law;[3] (2) in deciding whether there is a disputed material fact issue precluding summary judgment, the court must take as true evidence favorable to the nonmovant; and (3) the court must indulge every reasonable inference from the evidence in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 508 (Tex. App.–Tyler 2008, pet. denied).

---

[2] In its first issue, XH argues generally that the trial court erred in granting Cabot's and the Third Party Appellees' motions for summary judgment and in failing to grant summary judgment in its favor. *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970).

[3] The judgment sought shall be rendered forthwith if the summary judgment evidence on file shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out *in the motion or in an answer or any other response*. *See* TEX. R. CIV. P. 166a(c). Issues not expressly presented to the trial court *by written motion, answer, or other response* shall not be considered on appeal as grounds for reversal. *Id.*

## Contractual Construction and Conditions Precedent

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *See Coker*, 650 S.W.2d at 393; *CBI Indus.*, 907 S.W.2d at 520. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *See Coker*, 650 S.W.2d at 393; *CBI Indus.*, 907 S.W.2d at 520; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker*, 361 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

In interpreting a contract, we must presume that the parties thereto intended every clause to have some effect; therefore, we consider each part of the document with every other part of the document so that the effect and meaning of one part on any other part may be determined. *See Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.–San Antonio 2001, pet. denied). Moreover, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* Finally, we enforce an unambiguous agreement as written. *Id.* We are not permitted to rewrite an agreement to mean something it did not. *Id.* We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *Id.* Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.*

**Relevant Provisions from the Purchase Agreement and the JOA**

Here, while neither party argues that the agreements are ambiguous, each interprets their language differently, and neither concedes that its interpretation of the relevant passages is any less reasonable than the other party's interpretation of the same. The focus of our inquiry is whether Cabot's acquisition of the overriding royalty interests at issue is governed by the AMI provision in the JOA. Because the record indicates that the Purchase Agreement and the JOA were executed at the same time, for the same purpose, and in the course of the same transaction, we read and construe them together. *See **Jones v. Kelley***, 614 S.W.2d 95, 98 (Tex. 1981). Having done so, we note the following relevant provision in the Purchase Agreement:

> 1. **Assets to be Purchased** . . . . All leases subsequently acquired by either party to this Agreement that are located all or partly within one of the five (5) separate designated Areas of Mutual Interest established pursuant to the terms of the Joint Operating Agreement to be executed by the parties concurrent with the date of this instrument will be subject to the Area of Mutual Interest provision provided in the Joint Operating Agreement and the right for new lease acquisitions to be jointly acquired by the parties on an eighty percent (80%) for Hunt Petroleum Corporation, twenty percent (20%) Mullins & White Exploration, Inc., basis.

We further note the following relevant provisions in the JOA:

**ARTICLE III**
**INTERESTS OF PARTIES**

> . . . .
>
> C.        **Subsequently Created Interests:**
>
> [I]f, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production[,] or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest[. . . ]."
>
> The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay[,] and discharge the Subsequently Created Interest and shall indemnify, defend[,] and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party . . . .
>
> . . . .

**ARTICLE XVI**
**OTHER PROVISIONS**

A.        **SUBJECT TO PURCHASE AGREEMENT:**

This Operating Agreement is subject to all the terms and provisions of that certain Purchase Agreement dated November 28, 2007, between Hunt Petroleum Corporation and Mullins & White Exploration[,] Inc.[,] to which a copy of this Operating Agreement, dated November 01, 2007, is referenced therein, and to which reference is made for all purposes. In the event of any conflict between the provisions of this Operating Agreement and the Purchase Agreement, the provisions of the Purchase Agreement shall prevail and control.

. . . .

G.     **SUBSEQUENTLY CREATED INTERESTS:**[4]

Notwithstanding the provision of this Agreement to the contrary, if any Party hereto shall create an overriding royalty, production payment, net proceeds interest or other similar interest, subsequent to the effective date of this Agreement and is not jointly borne, or if such an interest was created prior to the effective date hereof but was neither recorded in the county/parish in which the Contract Area is located nor disclosed to all Parties hereto at the time of the execution hereof (any such interest created under the circumstances herein mentioned shall hereafter be referred to as a "Subsequently Created Interest"), such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

(1)     If non-consent operations are conducted pursuant to any provision of this Agreement, and the Party or Parties conducting such operations become entitled to receive the production attributable to the interest out of which the Subsequently Created Interest is derived, such Party or Parties shall receive same free and clear of such Subsequently Created Interest. The party creating same shall bear and pay all such Subsequently Created Interests and shall indemnify and hold the other Parties hereto free and harmless from any and all liability resulting there from.

(2)     If the owner of the interest from which the Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other Parties hereto under the provisions of Article VII.B. or under the appropriate state statutes shall cover and affect Subsequently Created Interest and the rights of the Parties shall be the same as if the Subsequently Created Interest had not been created. The owner of the interest from which such Subsequently Created Interest was derived shall be responsible to the owner of such Subsequently Created Interest for any amounts to which the latter may be entitled.

(3)     If the owner of the interest from which a Subsequently Created Interest is derived (i) elects to abandon a well under the provision of Article VI.E. hereof, (ii) elects to surrender a lease (or portion thereof) under the provisions of Article VIII.A. hereof, or (iii) elects not to pay rentals attributable to its interests in any lease and thereby is required to assign the lease or that portion or interest therein for which it elects not to pay rentals to those Parties paying such rental, any assignment resulting from such election shall be free and clear of the Subsequently Created Interest.

(4)     The owner creating such interest shall indemnify and hold the other Parties hereto harmless from any claim or cause of action by the owner of the Subsequently Created Interest.

---

[4] By written agreement dated April 9, 2009, the parties stated that "Article XVI.G. . . . is hereby amended to provide that Article XVI.G. is only applicable to that portion of Subsequently Created Interests when added to the existing burdens affecting an Oil, Gas[,] and Mineral Lease are in excess of twenty-five percent (25%)" and that, except as provided in the amendment agreement, the Purchase Agreement and JOA remained unchanged.

**H.	CONTRACT DISCREPANCIES[:]**

This Article XVI is intended to modify and supplement the other provisions of this Agreement. In the event of any discrepancies between the terms of this Article XVI and the remainder of this Agreement, the terms of Article XVI shall control.

. . . .

**N.	AREA OF MUTUAL INTEREST:**

At the time of the execution of this Agreement, the parties hereto take cognizance of the fact that there is hereby established Five (5) separate Areas of Mutual Interest (hereinafter sometimes referred to as "AMIs"), covering the area outlined on the plat attached hereto as Exhibit "A-1," "A-2," "A-3," "A-4," and "A-5" hereof. In the event that any party or parties acquire any oil and/or gas interest (which shall be deemed to include royalties, mineral interests, and other payments out of production) or oil and gas leases or other contract rights which allow the Participation for oil and/or gas, within the AMIs as hereinabove defined, then the non-acquiring party or parties shall have the right to acquire their proportionate interest therein in accordance with the terms and conditions as hereinafter set forth.

. . . .

6)	The provision of this AMI shall not apply . . . to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Agreement[.]

## Conflict Between AMI Provisions

XH argues that the AMI provision in Article XVI.N. of the JOA obligated Cabot to offer XH the right to purchase a proportionate share of the overriding royalty interests at issue. Cabot responds that it had no such obligation because the AMI provision in the Purchase Agreement conflicts with the AMI provision in the JOA on which XH relies. Thus, Cabot argues that, in accordance with Article XVI.A. of the JOA, the provisions of the Purchase Agreement prevail and control. In response, XH argues that the two provisions are harmonious and Cabot's actions dispel any doubt that it was obligated to offer more than "new lease acquisitions" to XH.

Based on our reading of these two agreements together, we first conclude that they are unambiguous. As a result, in conducting our analysis, we do not consider any extraneous evidence of actions taken by Cabot.[5] Turning to the relevant passages, the AMI provision in the Purchase Agreement plainly limits its scope to subsequently acquired leases. In contrast, the

---

[5] *See* **CBI Indus.**, 907 S.W.2d at 520 ("Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation[s] . . . and admit extraneous evidence to determine the true meaning of the instrument").

AMI provision in the JOA casts a broader net, indicating that it applies to the acquisition of any oil and/or gas interest, oil and gas leases, or other contract rights that allow the participation for oil and/or gas. Based on our reading of these provisions, we conclude that the scope of the AMI provision in the JOA is much broader than the scope of the AMI provision in the Purchase Agreement. Furthermore, there is no language in the JOA indicating that the terms of its AMI provision are intended to supplement the related provision in the Purchase Agreement. Similarly, the language of the Purchase Agreement fails to indicate that the acquisitions covered by its AMI provision may be supplemented by the AMI provision in the JOA or that its reference to "leases" is merely an example.

In sum, these two provisions—one narrow in its scope, and the other broad—are disparate and, despite XH's arguments to the contrary, cannot be harmonized. Accordingly, because there is a conflict between the AMI provisions in the Purchase Agreement and the AMI provision in the JOA, in accordance with Article XVI.A, the AMI provision of the Purchase Agreement prevail and control. Thus, we conclude that the overriding royalty interests acquired by Cabot were not governed by the AMI provision in the JOA. Therefore, we hold that the trial court did not err in granting summary judgment in favor of Cabot and the Third Party Appellees and denying XH's motion for summary judgment.

**Acquisition "Subject to this Agreement"**

Even had we concluded that the two AMI provisions were harmonious, the outcome of this appeal would not differ. Article XVI.N.6. sets forth that the AMI provision in the JOA does not apply to any acquisition of an interest that, prior to and at the time of its acquisition, was subject to the agreement.

As XH notes in its brief, because the overriding royalty interests at issue were created after the JOA had taken effect,[6] they were "subsequently created" and were, therefore, "subject to this agreement" in 2007. Thus, XH continues, at that point in time, they were excluded from the scope of the AMI provision.

But XH contends that the 2009 Amendment served to exclude the overriding royalty interests from the Subsequently Created Interests provision of the JOA. Specifically, it argues that M & W could never have reserved an overriding royalty that caused the royalty burden to exceed twenty-five percent and overriding royalties over twenty-five percent are the only

_____
[6] The overriding royalty interests were created by the December 12 Assignment.

overriding royalty interests that meet the definition of a "Subsequently Created Interest" following the 2009 Amendment. According to XH, no other provision of the JOA, except Article XVI.G., caused the overriding royalty interests to be "subject to" the agreement. Thus, XH urges that we give the 2009 Amendment's exclusion full effect by concluding that the overriding royalty interests were not subject to the JOA when Cabot acquired them, and, as a result, are subject to the AMI provision of the JOA. We disagree with XH's analysis.

As set forth above, Article XVI.G. outlines the parties' responsibilities under its enumerated circumstances when any party acquires a subsequently created interest.[7] In the 2009 Amendment, Guardian and XH agreed that "Article XVI.G. is only applicable to that portion of Subsequently Created Interests when added to the existing burdens affecting an Oil, Gas[,] and Mineral Lease are in excess of twenty-five percent (25%)[.]" As a result, the subsequently created overriding royalty interests at issue were no longer subject to the terms of Article XVI.G. They further agreed that apart from the alterations set forth in the amendment, the Purchase Agreement and JOA remained unchanged.

Moreover, subsequently created interests are also addressed in the JOA under Article III.C. Article III.C. defines subsequently created interests, including overriding royalty interests, and sets forth the responsibilities that the parties would bear when any party acquired such an interest. Article III.C. further provides that where the party whose interest is burdened by the subsequently created interest "fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party . . . ."[8]

In sum, the subsequently created overriding royalty interests at issue still are governed by Article III.C. Under this Article, these interests are specifically subjected to the enforcement terms of Article VII.B. And, finally, Articles III.C. and VII.B. were expressly left unchanged by the unambiguous terms[9] of the 2009 Amendment to the JOA. As a result, the overriding royalty

---

[7] "[S]uch Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, *as follows:* (1) . . . . (4) . . . ." (emphasis added).

[8] Article VII.B. concerns liens and security interests and manners in which the parties may enforce their obligations.

[9] XH contends that Cabot's records include a memorandum in which Cabot acknowledges that the subsequently created interest provision did not apply because of the 2009 Amendment. Because we conclude the

interests at issue were "subject to the agreement" as that term is used in Article XVI.N.4 by virtue of Articles III.C. and VII.B. Accordingly, we conclude that these interests were excluded from the AMI provision of the JOA.

XH's first and second issues are overruled.[10]

## DISPOSITION

Having overruled XH's first and second issues, we ***affirm*** the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered February 28, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

2009 Amendment and the JOA as it is affected by the amendment are unambiguous, we do not consider any extraneous evidence in our analysis. *See CBI Indus.*, 907 S.W.2d at 520.

[10] Because our analysis on these issues of contractual interpretation are dispositive of this appeal, we do not consider XH's third issue concerning whether the Areas of Mutual Interest provision in the JOA satisfied the statute of frauds. *See* TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 28, 2014**

**NO. 12-12-00338-CV**

**XH, LLC,**
Appellant
V.
**CABOT OIL & GAS CORP.,**
Appellee

Appeal from the 145th District Court

of Nacogdoches County, Texas (Tr.Ct.No. C1127288)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **XH, LLC,** for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*