# NO. 12-21-00225-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TOMMY VICE,*<br>*APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *EAST TEXAS MUNICIPAL UTILITY*<br>*DISTRICT,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Tommy Vice appeals the trial court's order granting Appellee East Texas Municipal Utility District's (ETMUD) motion for summary judgment and denying his motion for summary judgment. Vice raises seven issues on appeal. We affirm.

## BACKGROUND

Vice began working for ETMUD in 1990. In April 2008, Vice entered into a ten-year employment agreement with ETMUD, upon the approval of its board of directors, to work as its general manager. Among other things, the contract provided that Vice shall, at all times, "faithfully, industriously[,] and to the best of his ability, experience[,] and talents[,] perform all [his] duties to the reasonable satisfaction" of ETMUD. The agreement further set forth that ETMUD could terminate the agreement with or without cause,[1] but in the event of termination without cause, ETMUD was required to pay Vice's compensation for the remaining term of the agreement.

---

[1] The agreement defined "cause" as including "substantial breach by the Employee of the provisions of the Agreement, willful misconduct of the Employee, commission of fraud by Employee against employer, indictment on felony criminal charges[,] or any crime of moral turpitude and such other actions as may be to the detriment of Employer."

In 2011, Vice and ETMUD agreed to the amendment of "certain terms and provisions" of the 2008 agreement. The amendment, which ETMUD suggests that Vice represented to the board was approved by ETMUD's legal counsel, also was approved by ETMUD's board of directors.[2] The amendment extends the term of the original agreement until April 7, 2028, and, most notably, in Section 6.5, provides as follows:

> 6.5 Payment Upon Termination. Employee devoted his life to the successful development of this District and, therefore, if for any reason Employee's employment with Employer is terminated (including termination resulting from the dissolution of Employer), or (Employee's authorities, duties, responsibilities) or (status, including job title[] is materially altered in such a way as to induce discord or amounting to an effective termination, or (becoming partly or completely disabled as a result of job related activities whether singular or accumulated effect)[,]Employee shall be entitled to, and Employer shall be obligated to deliver to Employee all compensation identified in Employee's Employment Agreement under Item 3 Compensation, (Section 3.1 and 3.3 and 3.4) as if the contract and Employee's employment were completely satisfied without interruption for the full term agreed upon in this Amendment. Payment for (Section 3. l and 3.3 and 3.4), shall be made in a one-time, lump-sum and shall be due upon the termination of Employee's employment with Employer.

In 2016, the ETMUD board became concerned about Vice's management and performance. As the board's concerns grew in the ensuing year, Vice became less cooperative and took actions suggesting he wished to shield his conduct from scrutiny, such as locking board member Mike Danapas out of the ETMUD offices to prevent his accessing ETMUD financial records. Ultimately, Vice resigned before the October 26, 2017 board meeting and claimed he was owed a lump sum payment of more than $1,000,000 comprising his compensation through April 2028 pursuant to the amended agreement. Following his resignation, Vice never returned to ETMUD or otherwise performed his employment duties.

As a result, ETMUD suspended the October 26, 2017 board meeting so that it could evaluate Vice's claims. Within days, the board placed Vice on paid administrative leave and began an investigation into his conduct with the aid of an accountant and an information technology expert to determine whether he breached the employment agreement. During this time, Vice's legal counsel sent a letter to ETMUD dated February 12, 2018, in which he, on Vice's behalf, gave "final notice of his resignation." The first phase of ETMUD's investigation concluded on March 12, 2018. On March 14, counsel for ETMUD sent a letter to Vice

---

[2] Counsel for ETMUD denied that he approved the agreement as presented by Vice to ETMUD's board of directors and suggested that Vice changed certain provisions in the agreement after he initially reviewed it.

demanding that he return all property belonging to ETMUD still in his possession and setting forth that had Vice not resigned, based on the findings of its investigation, it would have terminated his employment based on his materially breaching the agreement.

Vice filed the instant suit on March 31, 2018, in which he alleged that ETMUD was liable to him for compensation through April 7, 2028, "regardless of when or why Vice's employment ended" and that its failure to so compensate him amounted to a breach of the 2008 employment agreement as amended. ETMUD answered and filed a counterclaim. Thereafter, Vice filed both no-evidence and traditional motions for summary judgment. ETMUD also filed a motion for summary judgment, in which it argued (1) the contract at issue lacks consideration, (2) the contract is unconscionable, (3) Vice materially breached the agreement, thereby excusing ETMUD's continued performance, and (4) the liquidated damages claim amounts to an unenforceable penalty. The trial court considered the motions on submission and, ultimately, signed an order by which it granted ETMUD's motion for summary judgment, ordered that Vice take nothing by his suit, and dismissed Vice's claims with prejudice. The trial court also signed an order denying Vice's traditional motion for summary judgment. Thereafter, the trial court severed Vice's claim against ETMUD from ETMUD's counterclaims, and this appeal followed.

## SUMMARY JUDGMENT

When, as here, the parties have filed competing and/or cross-motions seeking summary judgment, and the trial court grants one and denies the other; we review both motions and render the judgment the trial court should have rendered. *See Houle v. Casillas*, 594 S.W.3d 524, 541 (Tex. App.–El Paso 2019, no pet.). The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant who conclusively negates at least one essential element of the nonmovant's cause of action is entitled to summary judgment as to that cause of action. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. *Id.* Once the movant establishes a right to summary judgment, the nonmovant has the burden to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589

3

S.W.2d 671, 678–79 (Tex. 1979).  The only question is whether an issue of material fact is presented.  *See* TEX. R. CIV. P. 166a(c).

When reviewing summary judgments, we perform a de novo review of the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.  *See **Sudan v. Sudan***, 199 S.W.3d 291, 292 (Tex. 2006); ***KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.***, 988 S.W.2d 746, 748 (Tex. 1999).  We are not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits, and other summary judgment proof.  *See **Gulbenkian v. Penn***, 252 S.W.2d 929, 932 (Tex. 1952); ***Palestine Herald-Press Co. v. Zimmer***, 257 S.W.3d 504, 508 (Tex. App.–Tyler 2008, pet. denied).

Further, all theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court.  *See* TEX. R. CIV. P. 166a(c).  If the trial court's order granting summary judgment does not specify the grounds relied on for its ruling, we will affirm it if any of the theories advanced are meritorious.  ***State Farm Fire & Cas. Co. v. S.S.***, 858 S.W.2d 374, 380 (Tex. 1993).  Thus, when an appellant fails to negate each ground on which the judgment could have been granted, we must affirm.  ***Flores v. Hull Assocs. N., LP***, 657 S.W.3d 68, 75 (Tex. App.–El Paso 2022, no pet.).

### CONTRACTS, CONSIDERATION, AND PRIOR MATERIAL BREACH

In his first issue, Vice argues that the trial court erred in granting ETMUD's motion for summary judgment and denying his motion on the implied basis that the employment agreement, as amended, lacked consideration.

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument.  ***Coker v. Coker***, 650 S.W.2d 391, 393 (Tex. 1983); *see also **Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.***, 907 S.W.2d 517, 520 (Tex. 1995).  To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.  *See **Coker***, 650 S.W.2d at 393; ***CBI Indus.***, 907 S.W.2d at 520.  No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.  *See **Coker***, 650 S.W.2d at 393; ***CBI***

*Indus.*, 907 S.W.2d at 520; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker*, 361 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

In interpreting a contract, we must presume that the parties thereto intended every clause to have some effect; therefore, we consider each part of the document with every other part of the document so that the effect and meaning of one part on any other part may be determined. *See Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.–San Antonio 2001, pet. denied). Moreover, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* Finally, we enforce an unambiguous agreement as written. *Id.* We are not permitted to rewrite an agreement to mean something it did not. *Id.* We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *Id.* Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.*

Here, while neither party argues that the agreement is ambiguous, each interprets its language differently, and neither concedes that its interpretation of the relevant passages is any less reasonable than the other party's interpretation of the same.

## Consideration

To be enforceable, a contract must be based on consideration, also known as mutuality of obligation. *See Tex. Gas Utils. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970). Consideration is a fundamental element of every valid contract. *Mosley*, 304 S.W.3d at 628. Consideration is a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting parties. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). The detriments must induce the parties to make the promises, and the promises must induce the

parties to incur the detriments. *Id.* Courts strive to construe a contract to promote mutuality and to avoid a construction that makes promises illusory. *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex. App.–Houston [14th Dist.] 2003, no pet.).

Lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties. *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.–Tyler 2010, no pet.). The contract lacking consideration lacks mutuality of obligation and is unenforceable. *Id.* Furthermore, if the parties modify a valid contract, the modification must be supported by new consideration. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). The existence of a written contract presumes consideration for its execution. *Mosley*, 304 S.W.3d at 628. Therefore, the party alleging lack of consideration has the burden of proof to rebut this presumption. *Id.*; *see also Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. App.–Dallas 1992, writ denied) (op. on reh'g) ("A sworn plea of no consideration placed the burden of proof on Edlund to show there was none").

A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and therefore, no contract. *Id.*

*Discussion*

In the instant case, the 2008 agreement contains several sections regarding "Employer's Right to Terminate," which discuss scenarios of termination with cause and termination without cause. Under these sections, only if Vice were terminated without cause, would he be entitled to his compensation for the remainder of the contract's term. In all respects, the 2008 agreement refers to circumstances in which ETMUD could terminate the agreement. The language of the 2008 agreement cannot be read to address the outcome in the event Vice himself were to terminate the agreement other than the sections setting forth that Vice's death or permanent disability would be treated as if he were terminated for cause.

By contrast, Section 6.5 of the 2011 amendment discusses the issue using the broader phrase, "Payment on Termination." Thereunder, rather than suggesting the consequences only of ETMUD's terminating the agreement, it refers to situations in which, "for any reason[,] [Vice's] employment with [ETMUD] *is terminated*[.]" (emphasis added). Section 6.5 sets forth that in that scenario, Vice "shall be entitled to, and [ETMUD] shall be obligated to deliver to [Vice] all

[due] compensation[.]" This more global language regarding Vice's employment's *being terminated* "for any reason" denotes a distinct change regarding Vice's entitlement to payment on termination. Unlike the 2008 agreement, it does not place termination scenarios solely in ETMUD's control. Rather, it refers more generally to a situation in which the agreement governing Vice's employment could end. *See Terminate,* THE AMERICAN HERITAGE DICTIONARY (2nd College ed. 1982) ("terminate" means "to bring to an end"). Thus, based on our reading of the agreement and its amendment, giving the terms used their plain, ordinary, and generally accepted meanings, we conclude that Section 6.5 of the 2011 amendment unambiguously sets forth that, from its execution, if Vice's employment is "brought to an end" for "any reason," he is entitled to the stated compensation for the remaining term of the contract. But therein lies the problem.

Among the innumerable, possible reasons Vice's employment could have been "brought to an end" is Vice's decision simply to resign. Thus, under the unambiguous terms of the agreement, from the moment the 2011 amendment took effect, Vice retained the option to resign, upon which he would be entitled to receive full compensation for the remaining term of the agreement. We reiterate that a promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. *In re 24R, Inc.*, 324 S.W.3d 567. Here, Vice retained the option to discontinue performance, and if he chose to do so, ETMUD would nonetheless be bound to pay him through the end of the contract's term. Accordingly, we conclude that the parties' contract, as amended, is illusory and, consequently, fails for want of consideration. *Id.* Therefore, we hold that the trial court did not err in granting ETMUD's motion for summary judgment and denying Vice's motion on this implied basis.

But even if we concluded that the language of the contract, as amended, was ambiguous, the outcome would not change. Under the parol evidence rule, absent fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written contract that is facially complete and unambiguous. *Carrizo Oil & Gas, Inc. v. Barrow-Shaver Res. Co.*, 516 S.W.3d 89, 95 (Tex. App.–Tyler 2017), *aff'd on other grounds*, 590 S.W.3d 471 (Tex. 2019). Thus, had we concluded that there existed an ambiguity as to the use of the word "termination" in Section 6.5, we would have considered extrinsic evidence to determine the parties' intent. Based on our review of the record, the following testimony from Vice's deposition supports our interpretation of Section 6.5:

Q. So would you agree that this agreement, it amends and adds to the '08 agreement; it doesn't cancel the '08 agreement?

A. Correct. The parts of the amendment that conflict with the first employment agreement, the amendment would override or supersede any conflicts.

Q. Well, let me just ask you this. Is it your position that upon the 2011 amendment being signed, that the District no longer had the right to terminate you for cause?

A. That is correct.

Q. And that's what you're referring to as the golden umbrella?

A. Correct.

. . . .

they knew that basically what they were doing was locking my job when they couldn't even fire me.

Q. Even for cause?

A. Not for anything. The City couldn't fire me, the District couldn't fire me, the State couldn't fire me.

Q. There was nothing you could do that would have given them the right to fire you?

A. No.

Q. And that -- and you're saying that based upon the language of 6.5 of Exhibit 3 which is the 2011 amendment to your contract?

A. Correct.

. . . .

[Q.] [Y]our contention is that if your employment ended or ends for any reason whether by termination for cause, termination without cause, or resignation, then the District has to pay you through April 7, 2028; is that correct?

A. Correct.

. . . .

Q. If five years into the agreement following the amendment you said, I resign, I don't want to work here anymore, they still have to pay you through the end of the term?

A. Correct.

Q. If three years after you signed the amendment, you said I resign, your contention is they still have to pay you through the end of the agreement?

A. Correct.

Q. If three days later --

8

A. Correct.

. . . .

Q. And to keep going down that road, say three minutes after you signed it, same thing, they would still owe you through 2028?

A. Yeah.

From his testimony, it is apparent that Vice envisioned that Section 6.5 provided for a situation in which he would be entitled to full compensation throughout the term of the agreement, no matter what. That Vice intended Section 6.5's "termination" language specifically to include a scenario in which he resigned further is demonstrated by the fact that Vice ultimately resigned and demanded that ETMUD pay his due compensation through the term of the contract as amended. Thus, had we not found the agreement to be unambiguous, upon consideration of extrinsic evidence, we similarly would conclude that the "termination" language in Section 6.5 includes termination of employment by Vice's resignation, thus rendering the agreement as amended illusory and failing for want of consideration. Vice's first issue is overruled.[3]

## Prior Material Breach

Assuming further that the amended employment agreement did not fail for want of consideration, the outcome would not change. In his fourth issue, Vice argues that the trial court erred in granting ETMUD's motion for summary judgment and denying his traditional motion for summary judgment on the implied basis that Vice committed a prior material breach of the employment agreement, thereby excusing ETMUD's continued performance.

"A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.–Houston [1st Dist.] 2010, no pet.). When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 303 (Tex. App.–Houston [14th Dist.] 2017, no pet.). In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it reasonably could have

---

[3] Having overruled Vice's first issue, we need not consider his remaining issues. *See* TEX. R. APP. P. 47.1.

anticipated from full performance. ***Hernandez v. Gulf Group Lloyds***, 875 S.W.2d 691, 693 (Tex. 1994). Excused performance of contract due to the other party's prior material breach is an affirmative defense. ***Masson***, 333 S.W.3d at 834.

Nonetheless, it is a fundamental proposition of contract law that when one party materially breaches a contract, the other party is put to an election of continuing or ceasing performance. *See **Compass Bank v. MFP Fin. Servs., Inc.***, 152 S.W.3d 844, 858 (Tex. App.–Dallas 2005, pet. denied). Any action by the nonbreaching party which indicates an intention to continue will operate as a conclusive choice. *See **id.*** Such choice will not deprive the nonbreaching party of its cause of action for the breach which already has taken place, but rather, only will deprive it of any excuse for ceasing performance on its own part. *See **id.***

*Discussion*

Here, the agreement provided, in pertinent part, as follows:

4.1 **Duties**: Employee is employed in the capacity of District General Manager. Employee shall perform (and hereby agrees to perform) such other functions related to the operation of the water district at Employer's request. Employee shall at all times faithfully, industriously[,] and to the best of his ability, experience[,] and talents perform all such duties to the reasonable satisfaction of the Employer.

. . . .

6.1 **Employer's Right to Terminate**: Employer may terminate this Agreement with cause providing notice thereof to Employee . . . . Cause for purposes of termination shall include substantial breach by the Employee of the provisions of the Agreement, willful misconduct of the Employee, commission of fraud by Employee against employer, indictment on felony criminal charges or any crime of moral turpitude[,] and such other actions as may be to the detriment of Employer.

. . . .

7. **Return of Property on Termination**: The parties agree that on termination of this Agreement by either party, whether or not for cause, all of Employer's property shall be promptly returned to Employer [by] employee. Without limiting the generality of the term "Employer's property," the parties stipulate that the term includes, but is not limited to . . . computer software and other property given by Employer and in possession or under direct or indirect control of employee.

ETMUD argued in its motion for summary judgment that, in addition to multiple instances of alleged misappropriation of ETMUD funds and property,[4] as well as the payment to himself of unearned compensation,[5] the following acts committed by Vice constitute material breach of the agreement:

> **Unbecoming, improper conduct at work**. While at work, Vice regularly watched pornography. He agreed that this constituted inappropriate behavior while at work. He also admitted that he posted "M4M" (Men for Men) "hookup" requests on Craigslist while at work.

> **Destroying important company data and software**. In October 2017, Vice wiped all data from his ETMUD-owned desktop computer. He threw away flash drives containing ETMUD records. He ran a scrubbing program on his ETMUD desktop and laptop computers, destroying ETMUD records in the process. He threw away ETMUD-owned computer hard drives containing ETMUD-owned records and software. He also deleted audio recordings of ETMUD board meetings. Vice admitted to engaging in much of this conduct in response to a Request for Admission. Vice, also testified that he instructed Best Buy employees to discard the hard drives on two District laptops.

In its brief, Vice does not argue that the trial court erred by impliedly finding that there was no genuine issue of material fact as to these two categories of conduct or any other allegation of prior material breach. *See Flores*, 657 S.W.3d at 75. We likewise conclude that the undisputed evidence supports that Vice, at least, engaged in these two categories of conduct. Nor does Vice argue on appeal that the trial court erred by impliedly determining that any of Vice's actions urged by ETMUD in its motion for summary judgment constitute prior material breach as a matter of law.[6] *See id.*

---

[4] ETMUD argued and provided summary judgment evidence to support that Vice (1) used ETMUD funds to pay his son's orthodontia bills, (2) directed retirement funds to a bank account he had personal access to, (3) paid personal income taxes with ETMUD funds, (4) misappropriated ETMUD funds to buy a series of items for his personal truck, including window tint, "nerf bars," a performance chip, and truck slides, (5) bought gas for his personal truck, paid his personal tollway account with ETMUD funds, and filled his truck with ETMUD's fuel, while also receiving a $600 monthly vehicle allowance, (6) had ETMUD pay his mother's Sam's Club membership with ETMUD funds for twelve years, (7) paid himself bonus compensation while on paid vacation leave, and (8) on his last day in office in October, issued himself a "Christmas bonus" of just under $10,000.

[5] ETMUD also argued and provided summary judgment evidence to support that Vice (1) awarded himself excess compensation totaling over $190,000 between 2013 and 2017, even though the employment agreement specified that he only was entitled to annual salary increases of 2.5 percent, (2) awarded himself excess pay for vacation and sick leave exceeding what was contractually permissible by over $85,000 between 2011 and 2017, even though the agreement restricted vacation and sick leave accrual to no more than thirty and ninety days respectively and did not permit Vice to cash out unused leave, and (3) awarded himself bonuses of over $26,000 between 2013 and 2017, even though the agreement made no specific provision for the payment of bonuses.

[6] Generally, materiality is an issue "to be determined by the trier of facts." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017). Like other issues of fact, materiality may be decided as a matter of law only if reasonable jurors could reach only one verdict. *Id.*

Instead, Vice argues only that ETMUD is precluded from claiming that any prior material breach of the agreement on his part excuses ETMUD's performance under the agreement because it continued to perform following the date of the several alleged breaches. However, Vice's argument misconstrues the nature of an election. In this context, the term "election" means the "choice" between continuing or ceasing to perform. *See Election of performance*, BLACK'S LAW DICTIONARY (10th ed. 2009). "Choice" is the act of making a decision and selecting from possible alternatives. *See Choice*, *choose*, THE AMERICAN HERITAGE DICTIONARY (2nd College ed. 1982). It is axiomatic that such an election, to be binding, must be made with knowledge of the fact that a breach has occurred, so that the choice constituting the election is an informed one. *See id.* Indeed, if the nonbreaching party has no knowledge of the facts potentially amounting to a material breach, its continuing to perform under the contract cannot be said to have resulted from any sort of choice. *See id.*; *cf., e.g.*, **White v. Blackman**, 168 S.W.2d 531, 535 (Tex. Civ. App.–Texarkana 1942, writ ref'd w.o.m) (to constitute "election" to take under a will, party must have had knowledge of his rights, knowledge of his duty to choose between inconsistent rights, and must have intended to make election as shown by words and acts, viewed in light of all circumstances).

Here, the record reflects that within days of Vice's resignation, the ETMUD board placed him on paid administrative leave and began an investigation into his conduct with the aid of an accountant and an information technology expert to determine whether he breached the employment agreement. The first phase of the investigation concluded on March 12, 2018, and on March 14, counsel for ETMUD sent a letter to Vice demanding that he return all property belonging to ETMUD still in his possession and setting forth that had Vice not resigned, based on the findings of its investigation, it would have terminated his employment based on his materially breaching the agreement. We conclude that the summary judgment record reflects that, upon the conclusion of the first phase of its investigation into Vice's conduct, ETMUD acted with reasonable expediency to notify Vice that, had he not resigned, it would have terminated the agreement based on his acts constituting material breach. Therefore, we further conclude that ETMUD's continued performance under the agreement prior to its becoming aware of Vice's acts comprising prior material breach does not amount to an election to continue the contract. *See **Compass Bank***, 152 S.W.3d at 858.

In sum, Vice has not challenged on appeal the trial court's implied findings that (1) there was no genuine issue of material fact as to any of ETMUD's allegations of prior material breach or (2) that Vice's acts constitute material breaches as a matter of law. *See Flores*, 657 S.W.3d at 75. Further, his argument that ETMUD elected to continue its performance under the contract despite his acts of material breach is without merit. Thus, assuming arguendo that the employment agreement did not fail for want of consideration, we conclude that the trial court did not err in granting ETMUD's motion for summary judgment and denying Vice's motion for summary judgment on the implied basis that ETMUD's continued performance under the agreement was excused due to Vice's prior material breach of the agreement.

## DISPOSITION

Having overruled Vice's first issue, we *affirm* the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered April 20, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 20, 2023**

**NO. 12-21-00225-CV**

**TOMMY VICE,**
Appellant
V.
**EAST TEXAS MUNICIPAL UTILITY DISTRICT,**
Appellee

Appeal from the 114th District Court
of Smith County, Texas (Tr.Ct.No. 18-0793-B)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, all costs of this appeal are assessed against Appellant, **TOMMY VICE**, and that this decision be certified to the court below for observance.

Greg Neeley., Justice
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*